## THIS OPINION IS A PRECEDENT OF THE TTAB

Mailed:
March 24, 2011

**UNITED STATES PATENT AND TRADEMARK OFFICE**

_____

**Trademark Trial and Appeal Board**

_____

In re Kysela Pere et Fils, Ltd.

_____

Serial No. 77686637

_____

Adrienne L. White of WRB-IP LLP for Kysela Pere et Fils, Ltd.

Ronald L. Fairbanks, Trademark Examining Attorney, Law Office 117 (Brett Golden, Managing Attorney)

_____

Before Seeherman, Walters and Ritchie, Administrative Trademark Judges.

Opinion by Seeherman, Administrative Trademark Judge:

Kysela Pere et Fils, Ltd. has appealed the final refusal of the trademark examining attorney to register HB, in standard characters, for wine.[1] Registration has been refused pursuant to Section 2(d) of the Trademark Act, 15 U.S.C. §1052(d), on the ground that applicant's mark so

_____

[1] Application Serial No. 77686637, filed March 9, 2009, based on Section 1(a) of the Trademark Act, 15 U.S.C. § 1051(a), asserting first use and first use in commerce as of September 18, 2008.

resembles the following marks, registered by the same entity, that as used on applicant's identified goods, it is likely to cause confusion or mistake or to deceive. Registration No. 666366[2] is for beer



and Registration No. 3211587[3] is for goods and services in eleven classes, one of which is Class 32, and identifies, inter alia, "beer."



---

[2] Issued August 26, 1958, based on an application filed pursuant to Section 1(a); renewed three times.
[3] Issued February 20, 2007, and based on an application filed pursuant to Section 66(a).

Our determination of the issue of likelihood of confusion is based on an analysis of all of the probative facts in evidence that are relevant to the factors set forth in In re E. I. du Pont de Nemours & Co., 476 F.2d 1357, 177 USPQ 563 (CCPA 1973). See also, In re Majestic Distilling Co., Inc., 315 F.3d 1311, 65 USPQ2d 1201 (Fed. Cir. 2003). In any likelihood of confusion analysis, two key considerations are the similarities between the marks and the similarities between the goods and/or services. See Federated Foods, Inc. v. Fort Howard Paper Co., 544 F.2d 1098, 192 USPQ 24 (CCPA 1976). See also, In re Dixie Restaurants Inc., 105 F.3d 1405, 41 USPQ2d 1531 (Fed. Cir. 1997). We therefore turn first to the factor of the similarity of the goods.

As we have stated many times, it is not necessary that the goods or services of applicant and the registrant be similar or competitive to find that they are related for purposes of demonstrating a likelihood of confusion. That is, the issue is not whether consumers would confuse the goods or services themselves, but rather whether they would be confused as to the source of the goods or services. It is sufficient that the respective goods or services are such that they would or could be encountered by the same persons under circumstances that could, because of the

similarity of the marks, give rise to the mistaken belief that they originate from the same producer. See In re Rexel Inc., 223 USPQ 830, 831 (TTAB 1984); In re International Telephone & Telegraph Corp., 197 USPQ 910, 911 (TTAB 1978).

The examining attorney asserts that applicant's identified "wine" is related to the "beer" identified in the cited registrations, and has submitted, in support of that position, a substantial number of registrations showing that various entities have registered a single mark for both goods.[4] See, for example, Reg. No. 3099373 for SCHILLINGBRIDGE for beer and wine; Reg. No. 3456841 for DEFENDERS OF FREEDOM CHOICE for beer and wine; Reg. No. 3522339 for WORK TRUCK for beer, wine, distilled alcoholic beverages and alcoholic malt beverages; Reg. No. 1815068

---

[4] The examining attorney has explained in his brief that some of the approximately thirty registrations that were made of record have now been cancelled or were not based on use in commerce, and we have given these registrations no consideration. Applicant has asserted that those registrations which include food items should not be considered, but we disagree. Although a registration that covers a large number of goods and services in many classes has limited probative value because the inclusion of many disparate goods and services does not show that all of these items would generally emanate from a single source under a single mark, there is an intrinsic connection between food and beverage products. In any event, even if we considered only the registrations for beverage products alone there are a significant number of such third-party registrations.

We also note that in his brief the examining attorney has misidentified the numbers of several of the registrations. However, copies of the registrations themselves, which are of record, bear the correct registration numbers.

for MB for beers and other beverages and wine and other alcoholic beverages; Reg. No. 2595289 for TTL for beer and other beverages and wine and other alcoholic beverages; Reg. No. 2721021 for DENIM for beer and other beverages, wines and liquors; and Reg. No. 3396347 for UNCLE SAM for wine, wine coolers, alcoholic punch, beer, soft drinks, colas, fruit drinks and energy drinks.

Third-party registrations which individually cover a number of different items and which are based on use in commerce serve to suggest that the listed goods and/or services are of a type which may emanate from a single source. See In re Albert Trostel & Sons Co., 29 USPQ2d 1783 (TTAB 1993).

Applicant argues that because the examining attorney has submitted "only" about thirty third-party registrations,[5] and there are many thousands of applications and registrations in the USPTO database that include "wine" or "beer" in their identifications, the thirty registrations represent "a negligible percentage (.00025-.00053) and not nearly enough to establish a relationship between the goods sufficient to lead to a finding of

---

[5] This number includes all the registrations that were made of record, even the cancelled and other registrations which we have treated as not probative.

likelihood of confusion in this case." Brief, p. 16. In support of this claim applicant has submitted the first page of two searches of the USPTO TESS database, one of which was for applications and registrations in which "wine" was found in the goods/services field, and one of which was for applications and registrations in which "beer" was found in that field. The search results list only the application serial number or registration number, mark, and status of the applications or registration ("live" or "dead").[6] They indicate that the term "wine" is found in the goods/services field of 34,636 records, and "beer" is found in the goods/services field of 22,194 records.

We do not find applicant's position persuasive. First, there are problems with applicant's methodology. The fact that an application or registration contains the term "beer" and is therefore retrieved by one search does not mean that the same application or registration does not contain the term "wine" as well. In fact, although

---

[6] We recognize that to make a registration properly of record a copy of the registration, and not just a list such as applicant's submission, must be filed. See In re Dos Padres Inc., 49 USPQ2d 1860, 1861 n. 2 (TTAB 1998); In re Wada, 48 USPQ2d 1689, n.2 (TTAB 1998), aff'd., 194 F.3d 1297, 52 USPQ2d 1539 (Fed. Cir. 1999). However, under the circumstances of this case, we have considered the TESS listings for whatever probative value they may have.

applicant has submitted only the first 27 records retrieved by one search, and the first 28 records retrieved by the other, a cursory review shows that at least three of the same applications/registrations are listed in each (Ser. Nos. 79072731, 79072520 and 79054552), thus indicating that both "wine" and "beer" may appear in the same identification.  Further, as the examining attorney points out, because the identifications themselves are not listed, the search could include applications and registrations in which the terms "wine" and "beer" are used in identifications that are not for these beverages.  For example, the identifications may instead be for "wine glasses" or "root beer."  And, of course, third-party applications have no probative value except to show that an application has been filed, and "dead" or cancelled registrations have no probative value at all.  Here, applicant has not provided any information as to the number of third-party registrations which purport to be for "wine" or for "beer," but not for both, or the number of such registrations that are still active.  (Of the two "beer" registrations appearing on the page submitted by applicant, one is listed as "dead.")[7]

---

[7]  Although a minor point, we also note that applicant's mathematical approach is not correct, since it has combined the

7

Most importantly, the fact that the examining attorney submitted approximately twenty probative third-party registrations[8] listing beer and wine does not mean that they are the only registrations that include these goods. There is no requirement for the examining attorney to submit all the evidence that supports his position and, indeed, the Board would be very critical if the examining attorney were to submit an inordinate number of registrations. Cf. In re Max Capital Group Ltd., 93 USPQ2d 1243, 1246 (TTAB 2010) ("The Board has frequently stated, in connection with the submission of articles retrieved by a NEXIS search, that it is not necessary that all articles be submitted" and "the same is true for materials retrieved through Internet searches").

We also note that the Board has previously rejected a similar argument regarding third-party registrations made by an applicant in In re G.B.I. Tile and Stone Inc., 92 USPQ2d 1366, 1370 (TTAB 2009):

> It [the evidence submitted by applicant] simply
> consists of registrations that list one of
> applicant's goods but do not include any goods
> that are in the cited registration, or
> registrations that list one of the goods in the
> cited registration but do not include any of

results of the two searches in calculating the percentage that the examining attorney's submissions bear to the total.
[8] As stated previously, we have not considered any registrations that are not based on use in commerce, are not active, or list a wide range of unrelated goods.

applicant's identified goods.  We give this evidence much less weight.  There is no requirement for goods to be found related that all or even a majority of the sources of one product must also be sources of the other product.  Therefore, evidence showing only that the source of one product may not be the source of another product does not aid applicant in its attempt to rebut the evidence of the examining attorney.  Second, the mere fact that some goods are not included in a registration's identification of goods does not establish that *the owner of the mark* has not registered the mark for those goods in another registration since, for example, the registrant may have begun using the mark on those goods at a later date. ...  The fact that applicant was able to find and submit for the record these registrations of marks for individual items does not rebut the examining attorney's evidence showing the existence of numerous third-party registrations using the same marks on a variety of items, including applicant's and registrant's goods.  Therefore, contrary to applicant's argument (Reply Brief at 7), while this evidence provides some indication that there are many trademarks that are not registered for both products, it does not rebut the examining attorney's evidence that the goods are related.

We find the third-party registration evidence in this case is sufficient to demonstrate the relatedness of "wine" and "beer."  See In re Sailerbrau Franz Sailer, 23 USPQ2d 1719 (TTAB 1992) (wine and beer found related goods based on third-party registrations).  However, the examining attorney has also submitted evidence consisting of webpages

9

that show that companies make and sell both wine and beer.[9]

See, for example, the following:

> SchillingBridge, described as "the nation's first
> farm winery/microbrewery combination," with an
> address in Nebraska
> www.schillingbridgewinery.com;
>
> Old North State Winery to Brew Beer (title)
> Old North State Winery is joining the growing
> micro-brewing beer business, with plans to start
> distributing its brews to bars and restaurants
> next year!
> [dated November 6 (no year), printed by examining
> attorney November 15, 2009]
> www.topix.com
>
> When Jim's daughter and son-in-law started
> Gruhke's Microbrewery in 1998, Kirk was there to
> help.  With the addition of the microbrewery Bias
> became the first in Missouri, second in the
> nation, to operate as a winery and microbrewery
> combined.  Kirk continues the beer-making
> operation.  There are always 4 microbrews and 3
> domestics available at any given time….
> In addition to tasting beer and any of the 14
> wines produced at the winery….
> www.hermannhill.com
>
> Welcome to Charleville Vineyard Winery &
> Microbrewery [title]
> …owners Jack and Joal [sic] Russell pride
> themselves on offering distinctive, hand-crafted
> wines and microbrewed beers…
> [address in Missouri]
> www.charlevillevineyard.com
>
> The website for WAGNER Vineyards advertises, in
> addition to wine, WAGNER VALLEY beer.
> www.wagnervineyards.com

---

[9] We have not considered the webpages for an Australian brewery. Although this website is obviously available to consumers in the United States, there is no basis for us to conclude that U.S. consumers would be exposed to it.

Applicant contends that this evidence, including the topix.com listing which mentions prospective selling of beer, is not sufficient to show that consumers would expect a brewery to produce wine and vice versa. However, we need not consider whether this evidence, alone, would be sufficient because this is not the only evidence that shows the relatedness of beer and wine. As noted, there is substantial third-party registration evidence. The website evidence lends further support to our conclusion that the goods are related because the websites show that consumers have been exposed to the concept that wineries also make and sell beer. The third-party registration evidence and the website evidence together amply demonstrate the relatedness of beer and wine, and show that consumers, if they encountered both goods sold under confusingly similar marks, are likely to believe that they emanate from the same source.

Before leaving the topic of the relatedness of the goods, we must comment on both applicant's and the examining attorney's arguments regarding whether wine is within the registrant's natural scope of expansion. The examining attorney, citing In re 1st USA Realty Professionals Inc., 84 USPQ2d 1581, 1584 (TTAB 2007), stated that "evidence that third parties offer the goods

11

and/or services of both the registrant and applicant

suggest [sic] that it is likely that the registrant would

expand their business to include applicant's goods and/or

services," Office action Nov. 16, 2009, and applicant

responded by noting that, although one of the cited

registrations herein, No. 3211587, is for a wide variety of

goods and services, it does not include "wine," thereby

indicating that the registrant has no intention to expand

to such goods. However, the examining attorney's statement

and applicant's response is not a correct interpretation of

1st USA Realty, which explained that the expansion of trade

doctrine is more appropriate to inter partes cases, and

that in the context of an ex parte proceeding the analysis

should be whether consumers are likely to believe that the

services emanate from a single source, rather than whether

the owner of the cited registration has or is likely to

expand its particular business to include the goods of

applicant. To be clear, examining attorneys may and are

encouraged to use evidence of third-party registrations

that include in their identifications the goods and

services of the applicant and the goods and services

identified in the cited registration(s), and to use

Internet, catalog and advertising information to show third

parties offer for sale the same types of goods or render

12

the same services that are identified in the application and cited registration(s). However, the purpose of such evidence is to show that consumers are likely to believe that such goods and services emanate from a single source, in other words, is evidence from which we can draw the conclusion that the goods and services are related. The significance of this evidence is not to show the probability that the owner of the cited registration(s) is likely to expand the use of *its* mark to the goods or services of the applicant. Therefore, neither the argument by an examining attorney that the applicant's goods or services are within the natural scope of expansion of the goods or services of the registrant, nor the argument by an applicant that it is not likely that the *particular* registrant that owns the cited registration(s) will so expand its use of its mark, is applicable in an ex parte proceeding. Accordingly, in our analysis of the similarity of the goods in the present case we have not considered whether the owner of the cited registrations is likely to expand into selling wine. The evidence that third parties have adopted a single mark for beer and for wine (as well as the evidence that third parties sell both beer and wine) is sufficient to show that the public is likely to believe that these goods emanate from a single source.

The next du Pont factor we consider is the channels of trade. Although not specifically discussed by applicant or the examining attorney, it is clear from their comments that there is no dispute that beer and wine are general consumer goods that are sold to adult members of the general public. It is also common knowledge that these goods can be purchased in liquor stores and, in some cases, supermarkets and other retail outlets. Further, applicant's own website, pages of which were made of record by the examining attorney, describes applicant as a "Fine Wine Merchant Importer and Wholesaler," and shows that applicant offers, as categories of products, both wine and beer. This du Pont factor favors a finding of likelihood of confusion.

With respect to the factor of the conditions of purchase, again, beer and wine are general consumer items that are purchased by the (adult) general public. Although applicant has asserted that the "higher ends [of beer and wine] can be beyond what many consumers want or can afford to pay," brief pp. 19-20, applicant also acknowledges that "there is a wide range of prices involved with both beers and wines." Brief, p. 19. Therefore, we must consider the goods as identified in the application and the cited registrations to include all price points, including those

at the low end of the range.  And these less expensive items will not necessarily be purchased with any degree of care, or with knowledge by sophisticated purchasers.  On the contrary, these goods may be purchased on impulse.  This du Pont factor favors a finding of likelihood of confusion.

This brings us to a consideration of the marks.  Applicant seeks to register HB in standard characters.  The cited registrations are for marks consisting of a crown design over the letters HB, surrounded by an oval background.  In comparing the marks we are guided by the principle that, in articulating reasons for reaching a conclusion on the issue of likelihood of confusion, there is nothing improper in stating that, for rational reasons, more or less weight has been given to a particular feature of a mark, provided the ultimate conclusion rests on a consideration of the marks in their entireties.  In re National Data Corp., 753 F.2d 1056, 224 USPQ 749, 751 (Fed. Cir. 1985).

Applicant argues that the crown design plays a dominant role in the registered marks, and therefore this element is sufficient to distinguish the registrant's marks from applicant's.  Applicant bases this position on information from the registrant's website which states that

the registrant has an establishment in Munich, Germany called "Hofbräuhaus München," that it has one of Munich's oldest breweries and gives a history of its brewery, which indicates that the brewery originated during the reign of Wilhelm V, Duke of Bavaria, in 1592, and when the duchy of Bavaria became a kingdom the Hofbrauhaus became the royal Hofbrauhaus. According to applicant, the crown design "indicates this royal pedigree, and implicitly signifies royalty even to those who may not be aware of the company's history." Brief, p. 9.

We are not persuaded by applicant's argument. Although information about the registrant's history appears on the company's website, we cannot assume that ordinary purchasers encountering the beer on a store shelf will be aware of the history of the German company. Rather than understanding the crown design as indicating that the beer was once brewed for royalty, consumers are likely to view the design merely as indicating that the goods are superior or "fit for a king," i.e., the crown has a laudatory suggestive connotation. And certainly the oval designs in the marks are merely background or "carrier" elements, and do not make a strong commercial impression. See In re Dixie Restaurants Inc., 105 F.3d 1405, 41 USPQ2d at 1534. Instead, we find that it is the letters HB that are the

16

dominant element of the cited marks. Visually, they are equal to or more prominent than the crown design; and the letters are the portion of the mark that will be articulated when a consumer refers to or calls for the goods. See In re Appetito Provisions Co., 3 USPQ2d 1553, 1554 (TTAB 1987) (If a mark comprises both a word and a design, then the word is normally accorded greater weight because it would be used by purchasers to request the goods or services). See also CBS Inc. v. Morrow, 708 F.2d 1579, 1581-82, 218 USPQ 198, 200 (Fed. Cir. 1983); and Giant Food, Inc. v. Nation's Foodservice, Inc., 710 F.2d 1565, 1570, 218 USPQ 390, 395 (Fed. Cir. 1983).

Applicant makes various arguments regarding these letters. Although inconsistent with its arguments about the pronunciation and meaning of the registrant's marks, as discussed infra, applicant contends that the letters in the cited registrations could be viewed as "I-B" because of the shared vertical element of the H and the B. We do not think this is likely, but even if some consumers did interpret the letters in this manner, there are still many consumers who will view the letters as HB. Moreover, because applicant's mark is in standard characters, and thus is not limited to a particular typestyle, if applicant were to obtain a registration it would provide protection

for applicant's use of HB with a shared vertical element. While we agree with applicant that its standard character format would not include use of the crown design (or the oval background), because of the laudatory suggestive nature of the crown design and the carrier nature of the ovals, the absence of these elements from applicant's mark and/or presence of them in the cited marks are not sufficient to distinguish the marks. Because of the dominance of the letters HB in the cited marks, the marks overall are similar in appearance.

In terms of pronunciation, applicant contends that "the cited marks might be read as including the verbal description of the crown, or as royal or royalty." Brief, p. 10. Applicant points to no evidence that would suggest that a consumer would refer to the marks in the cited registrations as CROWN DESIGN HB or ROYAL HB or ROYALTY HB. On the contrary, this contention runs counter to the reason underlying the general principle set forth above that in word and design marks the word portion normally is considered dominant, i.e., that it is the words and not the design that will be articulated by the consumer. Applicant also points to the specimen in the file of cited Registration No. 666366, which includes the words "Hofbrauhaus München," and states that consumers would

18

regard the HB as referring to "hofbrauhaus" and would
pronounce the mark as HOFBRAUHAUS. We are not persuaded by
this argument for many reasons. Suffice it to say that the
marks in the cited registrations are for the letters HB,
not the word HOFBRAUHAUS; that HB is not a recognized
abbreviation for "hofbrauhaus" and we see no reason why
consumers would regard HB as meaning "hofbrauhaus" simply
because both letters appear in that word, particularly
since "hofbrauhaus" is a generic term;[10] and that
registrant's registrations are evidence of the registrant's
exclusive right to use the *registered* marks in commerce,
without being required to include any additional wording
that may be displayed on a specimen that was submitted in
connection with obtaining one of the registrations.
Likelihood of confusion is determined based on the mark as
shown in the drawing of an application and the mark(s)
shown in the cited registration(s). Thus, the registrant
is free to use its registered marks without any reference
to "hofbrauhaus." See Kimberly-Clark Corp. v. H. Douglas

---

[10] During prosecution applicant submitted a definition of
"Hofbrauhaus" from an unidentified source that states, "Meaning
'Court Brewery' (as in a Royal Court), there are unrelated
breweries named 'Hofbrau' or 'Hofbrauhaus' (with or without the
Umlaut on the first 'a') in at least nine different towns in
Germany. The most famous—Hofbräu München—is of course in Munich,
although Hofbrau Freising brews more beer and is several hundred
years older. The name also refers to the famous Hofbräuhaus beer
hall in Munich."

Enters., Ltd., 774 F.2d 1144, 1147, 227 USPQ 541, 543 (Fed. Cir. 1985) (stating that trade dress associated with the mark of the opposed registration was irrelevant in distinguishing the mark because "such dress might well be changed at any time; only the word mark itself is to be registered"), and quoted by the Court in Cunningham v. Laser Golf Corp., 222 F.3d 943, 55 USPQ2d 1842, 1847-48 (Fed. Cir. 2000). See also In re Shell Oil Co., 992 F.2d 1204, 26 USPQ2d 1687, 1690 n.4 (Fed. Cir. 1993) (rejecting applicant's argument that it would use the applied-for mark in connection with its other trademarks; registrability is based on the description of the mark in the application); In re Lebanese Arak Corp., 94 USPQ2d 1215, 1220 (TTAB 2010) ("If applicant were to obtain a registration for its mark it would not be limited to use of the mark in conjunction with this trade dress, or in conjunction with the words 'Armenian Wine,' or to any particular rendition now in use"). Accordingly, because "Hofbrauhaus" is not part of the cited marks, and because the only element of the registrant's marks that can be articulated is "HB," which is identical to applicant's mark HB, we find that the marks are identical in pronunciation.

With respect to meaning, again, applicant would have us treat the HB as being the equivalent of "hofbrauhaus,"

and therefore treat the meaning of registrant's mark as "hofbrauhaus" while its mark, presumably, would have only the meaning of the letters HB. But for the same reasons that we found that the cited marks would not be pronounced "hofbrauhaus," we find that they do not have the meaning of "hofbrauhaus," but rather would be understood as merely the letters HB with a laudatory suggestiveness as to the superior or special nature of the goods due to the crown design. This suggestion, however, does not serve to distinguish the marks; both applicant's mark and the cited marks convey essentially the same meaning.

Thus, when the marks are compared in their entireties, they engender the same commercial impression, and the du Pont factor of the similarity of the marks favors a finding of likelihood of confusion.

These are the only du Pont factors discussed by applicant and the examining attorney, and the only factors on which any evidence has been submitted. Accordingly, we treat the other factors as neutral.

In conclusion, the marks are similar, the goods are related and are sold in the same channels of trade, and the goods as identified include inexpensive consumer goods which may be purchased by members of the general public who may not be particularly sophisticated about the goods and

may purchase them without the exercise of care.  In view thereof, we find that applicant's use of HB for wine is likely to cause confusion with the marks in the cited registrations.

Decision:  The refusal of registration on the basis of Registration Nos. 666366 and 3211587 is affirmed.